UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**LISA A. AMMANN**,                                    Case No. 6:15-cv-02230-KI

                              Plaintiff,              OPINION AND ORDER

          v.

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security**,

                    Defendant.


          Sherwood J. Reese
          Drew L. Johnson, P.C.
          1700 Valley River Dr.
          Eugene, OR 97401

                    Attorneys for Plaintiff

          Billy J. Williams
          United States Attorney
          District of Oregon


Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204

Erin F. Highland
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

KING, Judge:

       Plaintiff Lisa Ammann brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

       Ammann filed applications for DIB and SSI on May 30, 2012. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Ammann, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on April 16, 2014.

       On June 4, 2014, the ALJ issued a decision finding Ammann was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on October 8, 2015.

PAGE 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ found Ammann has the following severe impairments:  connective tissue disease, fibromyalgia, obesity, anxiety, and depression.  These impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Given these impairments, the ALJ found Ammann has the residual functional capacity ("RFC") to perform light work that is simple, repetitive, and routine.  The ALJ determined Ammann could not perform her past work, but could perform other work in the national economy including photocopying machine operator or mail clerk.  As a result, the ALJ found Ammann not disabled within the meaning of the Act.

## FACTS

Ammann, 33 years old as of her alleged disability onset date of June 15, 2008, has a college degree.  She has past work experience as a receptionist and office manager.  She worked as an on-call teacher's aide until January 2013, and continues to operate a pet sitting business she began in approximately 2009.  At the time of the hearing, Ammann had two children living with her.

Ammann's medical history up until about January of 2012 is unexceptional.  In fact, her medical records do not even begin until October 6, 2009, more than a year beyond her alleged disability onset date, at which time Ammann moved to Ashland and established care with Alan

Embry, M.D.  Dr. Embry assessed Ammann's previously diagnosed hypothyroidism and allergies.  Ammann noted having three children, one of whom has cystic fibrosis.  Subsequent appointments in 2010, including one where Ammann established care with Kristin Bradford, M.D., dealt with gynecological issues.  Her reported irritability, fatigue, and muscle aches were resolved by the birth control pill.  She was exercising most days and she felt good.  Similarly, in August 2011, Ammann presented for her routine annual pap smear and check up; she reported having a regular walking schedule, feeling no depression, no headaches, and sleeping five to eight hours a night.

Ammann experienced a muscle strain while working out with free weights in January 2012.  A week later, Ammann presented to Dr. Bradford complaining of feeling spaced out, problems sleeping due to pain in her hips, having stiff joints/muscles, and feeling thirsty with dry eyes.  She had a flattened affect.  Dr. Bradford thought the symptoms were suggestive of an autoimmune disease.

Sandra Horvath-Dori, M.D., with Samaritan Rheumatology, examined Ammann in February 2012.  Ammann told Dr. Horvath-Dori that her mother had recently died, at which time Ammann learned about her mother's rheumatological problems.  Ammann said the joint pain started about two years ago, with stiffness, intermittent numbness and tingling in her hands and arms several times a week, and haziness in her thinking.  Ammann had been working as a substitute for the school district, and had been doing some editing and writing.  She was single and raising three kids.  Her physical examination revealed normal findings.  Dr. Horvath-Dori identified "mild" symptoms and, after a positive blood test, diagnosed mixed connective tissue disease and prescribed plaquenil.  Tr. 339.

When Ammann returned to Dr. Bradford in March, she reported that the plaquenil was helping her sleep better and her pain levels had diminished from 8/10 to 5-6/10, although her pain levels had flared unexpectedly the day before and she had a bad headache.  Ammann was active with yoga and fitness classes.

Upon returning to Dr. Horvath-Dori in March 2012, Ammann reported feeling better, the dizziness side-effect had resolved, she was able to sleep, and she reported a modest improvement in her energy level.

A little less than two months later, Ammann told Dr. Horvath-Dori that she was having diarrhea, had lost her balance while gardening the previous week, and she felt more groggy and forgetful–she had appeared for work at the wrong school for a substitute teaching job.  She slept well only once a week.  She was exercising–on the elliptical three times a week, and zumba once a week.  Dr. Horvath-Dori started Ammann on fluoxetine since the doctor thought Ammann's multiple symptoms fit fibromyalgia.

The next month, in June 2012, Ammann saw Dr. Bradford and Dr. Horvath-Dori on the same day, but gave somewhat different reports.  Dr. Horvath-Dori noted Ammann had "not had good disease control" with the plaquenil, but she later wrote "improvement noted with plaquenil." Tr. 391.  Ammann reported less stiffness, but her fatigue was severe and she had not been able to take on teacher's aide jobs.  She had started fluoxetine, which improved her stiffness by 50%.  Her pain was in the hips, knees and shoulders, and she felt pain where her body touched the bed.  That same day, Ammann told Dr. Bradford that she had significant improvement on the plaquenil.  The doctor evaluated Ammann's digestive problems and a neck strain.  Dr. Bradford diagnosed irritable bowel syndrome and prescribed dicyclomine.

PAGE 7 - OPINION AND ORDER

Ammann sought counseling in July 2012 because she did not have a good support system, she had dealt with two deaths in the past year, and she needed to work on boundaries with her sister.  She was living with her 16 and 10-year-old sons.  She wanted to move, but did not have energy or the ability to function.  Ammann had just applied for disability.  Despite sadness and loneliness,"[e]ven at her worst, . . . she has always been able to attend to ADLs, and there have always been things such as gardening that give her pleasure."  Tr. 364.  Prozac was helping.  She was diagnosed with depressive disorder and anxiety state, unspecified.

In August 2012, Ammann reported to Dr. Horvath-Dori feeling in a much better mood with the fluoxetine, as well as improved stiffness, joint pain, and memory for work, although her bowel issues kept her from sleeping.  She did complain of headaches.  To the doctor, Ammann appeared less fatigued.  Ammann's gait was coordinated and smooth, she had no trouble standing from a seated position, and she was willing to continue taking the fluoxetine despite bad dreams "since it has improved other symptoms considerably."  Tr. 326.  At her routine gynecological examination, Ammann told Dr. Bradford she was "feeling well."  Tr. 367.

Ammann returned to Dr. Bradford in September 2012 complaining of bloating and diarrhea.  She was walking and doing yoga.  Sialagen had helped her dry mouth and eyes.  The doctor increased the fluoxetine to see if it would help her IBS.  At Ammann's appointment with Dr. Horvath-Dori, Ammann also reported improvement in her energy level, her memory, and her sleeping.  Her examination was normal, and Ammann displayed a smooth and coordinated gait and no difficulty standing from a seated position.

In October 2012, Ammann reported that the increase in fluoxetine to help with her IBS had disrupted her sleep.  Dr. Bradford reduced the dosage.  Ammann had found an over-the-counter medication to help with her gastrointestinal issues.

Ammann began therapy sessions with Carmen MacMillan, QMHP.  Ammann appeared on time, neatly dressed, with appropriate hygiene.  She appeared depressed.  Her thought content/process was within normal limits.  Ammann said that a recent medication dosage change had helped.  Ammann thought social isolation was interfering with her mental health stability; she worked from home and had no help with her kids.  She was looking for opportunities outside of the house, including local events and church activities.  Ammann continued counseling sessions with Tristin Young, QMHP, at which Ammann reported less anxiety and solving a housing problem.

Ammann's rheumatology care was transferred to Michelle Ryan, M.D., who met with Ammann in mid-December 2012.  At that appointment, Ammann reported a bad couple of days with fatigue and pain, but that "other than that it is a bit better." Tr. 316.  Her knees were stiff, and her neck and back were sore.  She was engaging in yoga stretching.  She complained of fogginess.  She no longer had trouble sleeping.  Dr. Ryan noted the medication provided 50% symptom improvement.  The most bothersome symptoms were fatigue and GI upset.  The doctor recommended low level frequent exercise, regular sleep, getting outside, and a daily rest period.

Young noted Ammann was "doing a lot better with her schedule and feeling less overwhelmed" in January 2013, although part of this was due to "one of her sons being gone and her lack of opportunities to substitute teach." Tr. 352.  Ammann did report problems with time management and all of her obligations "especially when she woke with pain." *Id.*  A few weeks

later, in the context of discussing her sons' conflicts with each other and with her, she said she

had been able to make "some changes in her employment which would allow her to have a little

time to herself."  At her appointments with Young in February 2013, Ammann continued to

report improvement, she was feeling better, the prozac was helping, and she had made changes to

reduce her stress.

At her rheumatology follow-up with Dr. Ryan at the end of February 2013, her IBS was

bothering her, although if she stayed on top of her diet it was not too bad.  She reported her

muscles were "pretty good," her joints were "fine overall" and she had no swelling.  Tr. 397.  She

had daily stiffness but it was not as bad as it used to be and lasted for only 30 to 60 minutes.  She

took ibuprofen for pain but did not need to do that daily.  She was walking, doing the elliptical,

and a weekly zumba class.  She reported her energy was improved; she had some bad days but

overall her energy was improving.  She had no problems sleeping.

She attended DBT therapy in March and at her appointment with Young she said she had

been better able to manage her anxiety; she did report some physical discomfort.  She had made a

decision regarding choir.  Young reported Ammann was "making great progress with" her

symptoms.  Tr. 473.

Throughout April 2013, Ammann told Young she had less anxiety, but she did not feel

physically well and she was tired.  At her May appointment with Young, Ammann felt she was

struggling with increasing responsibilities and challenges with her family, school, and work.  She

felt she was not meeting expectations.  She had not been feeling well.

Ammann told Dr. Bradford at her May 2013 appointment that she had lost 20 pounds by

exercising 15 minutes daily.  Her mood and memory were better on fluoxetine, though not as

improved as initially. Ammann had not been feeling well the last couple of weeks; her muscle/bone pain had responded to ibuprofen. She felt the time of year was stressful with the end of school. The doctor increased the fluoxetine dosage. A week later, Ammann told Dr. Ryan that she had been experiencing fatigue and all over pain the last four to five days. She had not been sleeping well. She also felt dizzy almost daily the past month. Her stomach issues had resolved. Dr. Ryan put Ammann on a Prednisone taper and gave Ammann instructions about how to stand from a seated position to avoid dizziness.

Ammann told Young in June that she felt her anxiety was improving and she was feeling more active; she credited the change in medicine which helped with pain. She continued to feel she was improving in July 2013, but felt "as if she is not able to maintain her efforts due to her medical issues." Tr. 458. Young thought Ammann appeared tired, but engaged.

At her July 2013 appointment with Dr. Ryan, Ammann reported improved sleep beyond stopping the Prednisone, improved dizziness, and better energy levels dependent on the day. Joints and muscles were good that day, and she was not having any stomach problems. She thought her fatigue and mood issues were related to her irregular menses.

At her December 2013 and January 2014 appointments with Young, Ammann was struggling with her children, economic stress, and social relationships, but she was making progress.

In February 2014, Ammann told Dr. Ryan that she was not doing very well; Ammann was experiencing digestive issues from a GI virus, was recovering from a hysterectomy, and felt unexplained exhaustion and sore muscles. Dr. Ryan gave Ammann a Prednisone taper.

PAGE 11 - OPINION AND ORDER

At her March 2014 appointments with Young, Ammann reported challenges with her son, but was using skills to resolve anxiety.  Young noted normal posture, behavior, mood and affect, as well as orientation, judgment, insight, and memory.  He thought her panic disorder was in partial remission, and that progress was being made in treating her major depressive disorder.  At the end of March 2014, Ammann told Young she was "extremely busy with her business efforts, to the point that it was affecting her physical health."  Tr. 445.

The next month, in April 2014, Dr. Ryan submitted a letter on Ammann's behalf explaining that Ammann reports 50% improvement in her symptoms as a result of medication, but that Ammann continues to experience fatigue, thinking problems, and gastrointestinal symptoms.  Dr. Ryan indicated that the doctor did not perform functional capacity tests, but that she felt Amman's "fatigue and pain issues will interfere with full time work and that I do not think she would be able to maintain a regular work week considering normal breaks etc."  Tr. 478.  The doctor also commented that joint pain would make repetitive work problematic.

Similarly, Young opined that Amman's anxiety and depression would pose "significant challenges for her in the workforce" and that Ammann has "not been able to maintain employment due to emotion overwhelm and due to the significant needs which she has to find balance between her mental health and her physical health."  Tr. 480.

## DISCUSSION

Ammann challenges the ALJ's treatment of Dr. Ryan's opinion, as well as Young's opinion.  She also argues the ALJ failed to properly assess her testimony.  She seeks an immediate award of benefits.

I.      Ammann's Credibility

Ammann testified that she drove to the hearing that day.  She had worked as a substitute teacher's aide in the past and currently owned a pet care business.  She stopped working as a substitute teacher's aide because she had a hard time getting up in the morning due to lack of sleep and because she had trouble standing.  She continued operating her pet care business, working two to three hours a day at the most but going in and out of the homes over the course of the day.  She performed other odd jobs (like writing, editing and notarizing) because "I didn't feel like I'd be a reliable worker, and I didn't want to be calling in sick all the time."  Tr. 37-38. Ammann sometimes felt so tired that she had to pull over while driving.  She complained of problems thinking clearly, "disabling headaches" twice a week, IBS symptoms, and widespread pain, joint pain and stiffness.  She drove her younger son to school, both the older and younger son helped with household chores and with the business, and on her good days Ammann would prepare enough food to cover the bad days.  She drove around town running errands.  She spent time on the internet for her business.  She walked to try and keep her weight down.  When she took the Prednisone, she felt more sore after the taper.  She napped during the day.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the

PAGE 13 - OPINION AND ORDER

claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

The ALJ found Ammann's testimony not entirely credible for several reasons. He commented on the unclear basis for the onset date of disability, especially since Ammann had continued working well beyond June 2008 and since there were no medical records verifying her alleged symptoms. Additionally, the ALJ pointed to the clinical findings, including her normal gait, the ease with which she stood, her normal muscle strength, and normal joints and normal range of motion. Medications also seemed to improve her symptoms. The ALJ commented on the lack of complaints regarding brain fog and headaches, and her inconsistent reports that her memory had improved. Finally, the ALJ relied on Ammann's daily activities as follows: driving herself to the hearing, running errands, operating a pet sitting business, shopping, attending church, doing chores, cooking, and caring for her boys. The ALJ felt it especially significant that

---

[1]The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence. Def.'s Br. 5, n.1. The Ninth Circuit has rejected her argument. *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

Ammann continued to work, including pet sitting, writing, and notarizing, and that she continued to look for other work, which he thought suggested she was not as debilitated as she asserted.

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). The ALJ relied on three appointments (all with Dr. Horvath-Dori) to support his conclusion that "the degree of limitation" reported by Ammann was not supported by clinical findings. The appointments the ALJ relied on were Ammann's first appointment with Dr. Horvath-Dori in February 2012, where the doctor characterized Ammann's symptoms as "mild," as well as two appointments in August and September 2012 after Ammann had added fluoxetine to her medication regimen and noted improvement in all of her symptoms. *See* Tr. 17 (citing examination findings from February, August, and September 2012).[2]

Ammann points out that these normal clinical findings do not undermine her testimony about her fatigue, pain, dizziness, and GI problems. Indeed, the ALJ did not explain which of Ammann's claimed limitations these "clinical findings" undermined. I also note that to the extent the ALJ was suggesting there were no clinical findings supporting Ammann's testimony about her limitations, it is not Ammann's responsibility to produce objective medical evidence of pain or fatigue. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Certainly, her medical records support her reports of fatigue, pain and GI problems.

---

[2] Doctors continued to note normal clinical findings, including no synovitis and full range of motion in December 2012 (Tr. 319), February 2013 (Tr. 398), July 2013 (Tr. 404) and in February 2014 (Tr. 410).

Additionally, the ALJ's notation about medication controlling Ammann's symptoms–citing appointments in August and September 2012 only–is not supported by substantial evidence in the record. Instead, the longitudinal treatment record reflects periods of improvement and periods of setback. For example, Ammann had worse symptoms in March 2012 (although she still reported actively exercising), and she felt unable to take on work in June 2012. Similarly, in December 2012, Ammann reported only 50% symptom improvement with medications, with fatigue and GI upset being the worst symptoms. Notes in March, April and May 2013 reflect that Ammann was feeling physically unwell. While her symptoms improved in June and July 2013, and there are no records in the fall of 2013, by February 2014 she reported not feeling well again. In March 2014, she said her work pace was affecting her physical health. Given this other evidence, absent discussion or explanation from the ALJ, the ALJ's conclusion that "treatment has been largely effective in controlling [Ammann's] symptoms" is not supported by substantial evidence in the record.

As Ammann points out, contrary to the ALJ's finding, she did complain about headaches and brain fog. The Commissioner does not defend this reason.

However, the ALJ also concluded that Ammann's activities of daily living "do not support a finding of disability" and that her activities are consistent with his RFC finding her capable of performing light work. Tr. 18. The sheer number of activities, together with her business operations, appears to be inconsistent with Ammann's testimony that she needed to lie down twice a day for between one and four hours. She drove her young son to and from school.[3]

---

[3] The record reflects Ammann was raising three children at the beginning of the relevant period, one of whom had cystic fibrosis, until at least February 2012. Tr. 290, 337.

She shopped.  She ran errands.  She performed chores at home, including laundry and cooking

(although sometimes with help).  She attended therapy sessions.  She attended church.  She

exercised regularly.  On top of these activities, she ran a pet sitting business two to three hours a

day, in addition to spending time on the internet running that business, as well as picking up

occasional jobs writing, editing and notarizing.  Even accepting that Ammann sought help from

her children, her level of activity was substantial.  *Compare Orn v. Astrue*, 495 F.3d 625, 639 (9th

Cir. 2007) (reading, watching television, and coloring " are so undemanding thta they cannot be

said to bear a meaningful relationship to the activities of the workplace"); *Ghanim v. Colvin*, 763

F.3d 1154, 1165 (9th Cir. 2014) (basic chores, sometimes with help of a friend, and occasional

social events, did not contradict testimony).

    Although they should consume a "substantial part of [the claimant's] day," courts have

held similar daily activities were sufficient evidence to support the ALJ's credibility finding.

*Compare Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) (grocery shop with assistance,

walk an hour in the mall, get together with friends, play cards, swim, watch television, and read

were insufficiently substantial) *with Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005)

(appropriate to consider ability to care for personal needs, cook, clean, shop, manage finances,

interact with boyfriend); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th

Cir. 1999) (fix meals, do laundry, work in the yard, occasionally care for friend's child); *Stubbs-*

*Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (cooking, cleaning, laundry, and

managing finances, which are normal "activities[,] tend to suggest that the claimant may still be

capable of performing the basic demands of competitive, remunerative, unskilled work on a

sustained basis").  Ammann has a different interpretation of the evidence, but the ALJ's

PAGE 17 - OPINION AND ORDER

conclusion that these daily activities were inconsistent with a finding of disability is just as rational. *Molina*, 674 F.3d at 1110 (court must uphold findings if they "are supported by inferences reasonably drawn from the record").

The fact that the ALJ improperly considered some reasons for finding plaintiff's credibility undermined does not mean that the ALJ's entire credibility assessment is improper. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004). However, I am unwilling to affirm the ALJ's credibility decision on the basis of Ammann's daily activities alone. I do note that there may be other relevant credibility factors which the ALJ should assess on remand. For example, while the ALJ expressed concern about the lack of evidence to support Ammann's alleged onset date, it is unclear to me whether the ALJ considered that lack of evidence to be a reflection on Ammann's credibility. I note that although the ALJ felt he could not "verify what symptoms" Ammann was experiencing, Ammann's medical history directly refutes her assertion that she became disabled in June 2008. Certainly as late as August 2011, at an appointment for birth control, Ammann reported "feeling well" with no numbness, tingling or weakness in the extremities and no depression. Tr. 275.

Additionally, comments Ammann made to her therapist in January 2013 suggest she stopped performing the substitute teacher's aide position for a reason other than her physical impairments. Indeed, not only was Ammann raising three children by herself until at least early 2012, she was also working as an on-call teacher's aide until at least January 2013, while operating her pet sitting business starting in 2009, with editing and writing jobs on the side. She also apparently continued to enjoy gardening and told her therapist she needed more opportunities outside of the house. It may also be worthwhile inquiring further about the extent

of Ammann's pet sitting business since she complained in March 2014 about being "extremely busy with her business efforts[,]" while also mentioning the physical toll it took on her.  Tr. 445. Finally, while there is medical evidence supporting the existence of headaches, the ALJ could properly question the severity of those headaches (described by Ammann as "disabling") when she never requested treatment for them.

II.    Medical Evidence

A.    Dr. Ryan

The ALJ gave Dr. Ryan's opinion "little to no weight" for three reasons.  Ammann had been working, she had continued to look for other work, and her activities of daily living demonstrated her capacity to work.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn*, 495 F.3d at 632.  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.

PAGE 19 - OPINION AND ORDER

It was a specific and legitimate reason, supported by substantial evidence in the record, for the ALJ to conclude that the extent of Ammann's activities, including her pet sitting business, tended to undermine Dr. Ryan's opinion that Ammann's fatigue and pain issues would interfere with full time work.  However, the ALJ did not address the second aspect of Dr. Ryan's opinion, which is that Ammann's joint pain would make repetitive work problematic.  The ALJ noted the references to joint pain in the medical records and did not expressly comment on the credibility of those complaints.  Since the RFC called for simple, repetitive, routine work, the ALJ needed to address this portion of Dr. Ryan's opinion.

      B.    <u>Young</u>

The ALJ also declined to give any weight to Young's opinion that Ammann's depression and anxiety would interfere with her ability to sustain employment.  The ALJ concluded that the treatment record did not support a finding that Ammann's mental health impairments were so significant that they rendered her incapacitated, and it appeared Young was unaware Ammann was working, had no problems performing her activities of daily living, and continued to look for work.

Young is considered among the "other sources" listed in the Social Security regulations who are not acceptable medical sources.  *See* 20 C.F.R. § 416.913(d)(1)-(4).  The ALJ may reject the opinions of such sources by giving reasons that are "germane" to that source.  *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

A review of Young's chart notes supports the ALJ's conclusion that Ammann's mental health impairment would not interfere with her ability to perform work.  *See, e.g.* Tr. 17 (referring to mental health treatment records as reflecting "modest problems" and records reflect

Amman's "ability to maintain her anxiety was getting much better"). When she initially sought treatment in July 2012, she reported that she had always been able to attend to her activities of daily living "even at her worst[.]" Tr. 364. Prozac was helping. She had therapy appointments in October and December 2012, and January, February, March, April, May, June, July, and December 2013. At some of these appointments, Ammann reported a need for more social engagement, she reported improvement in her mood, better ability to manage her anxiety, and when she reported struggling, Young always thought Ammann was making progress. Additionally, her behavior, mood and affect, and thought/content process was always normal. Finally, as I have found above, the extent of Ammann's daily activities, including the ongoing operation of her business, was also a germane reason to reject Young's opinion. The ALJ gave germane reasons to reject Young's opinion, which were entirely rational and supported by substantial evidence in the record.

III.    Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

PAGE 21 - OPINION AND ORDER

As I have described above, there are issues for the ALJ to resolve regarding Ammann's testimony about the extent of her limitations, with a specific need to focus on fatigue, as well as on Dr. Ryan's opinion regarding repetitive work.  Remand for further findings is necessary.

**CONCLUSION**

The decision of the Commissioner is reversed.  This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

DATED this ____15th____ day of November, 2016.


  /s/ Garr M. King_____
Garr M. King
United States District Judge